No. 36,832

AYLWARD PRODUCTION CORPORATION et al., *Appellees*, v. THE STATE CORPORATION COMMISSION OF KANSAS, *Appellant*.

(176 P. 2d 861)

Opinion filed January 25, 1947.

*Louis E. Clevenger*, of Topeka, argued the cause, and *Kenneth W. Wagner*, of Topeka, was with him on the briefs for the appellant.

*W. D. Jochems*, of Wichita, argued the cause, and *J. Wirth Sargent, Emmet A. Blaes, Roetzel Jochems* and *Robert G. Braden*, all of Wichita, were with him on the briefs for all appellees except Atlantic Refining Company; *W. E. Holmes, Howard L. Baker, Edward F. Arn* and *Richard F. Mullins*, all of Wichita, were on the briefs for appellee Atlantic Refining Company.

The opinion of the court was delivered by

SMITH, J.: This was an action wherein plaintiffs, by the filing of a petition for review pursuant to statute, sought to have the district court review an order of the state corporation commission which denied the oral application of plaintiffs to amend the general rules and regulations of the commission for the conservation of crude oil, so as to establish a minimum allowable of 25 barrels per day for oil wells in prorated pools in this state on the ground that the commission did not have power to make such an order. Judg-

ment of the district court was in favor of plaintiffs. The defendant has appealed.

The petition for review alleged that under G. S. 1945 Supp. 55-602 to 55-606, inclusive, the defendant was given authority over all matters arising thereunder; that prior to June 28, 1946, there was in effect an order made by the defendant providing for a minimum well allowable of 20 barrels per day; that at the regular monthly meeting of the commission an oral application was made to the commission asking it to increase this to 25 barrels per day; that plaintiffs appeared in support of the application, and others appeared in opposition to it and maintained that the commission had no authority to establish a daily minimum on wells in any prorated pool in excess of 15 barrels per day; that after hearing the commission held that it did not have authority to fix a state-wide minimum well allowable for oil wells in Kansas, and the application was denied; that a petition for rehearing was filed by plaintiffs and duly denied. The petition for review then alleged that the order denying the application was contrary to law and the evidence submitted at the hearing; that the commission in making the order failed to take into consideration all the powers granted to defendant and the duties imposed on it by the statute; that the commission interpreted the word "waste" as used in the statutes in its ordinary meaning and disregarded the fact that the meaning of that word was broadened by the provisions of G. S. 1945 Supp. 55-602, to include "economic waste." The petition then alleged that in order to prevent economic waste within the state in the production of oil it was necessary that a minimum daily allowable for oil wells in Kansas be fixed at 25 barrels per day and alleged that the force of that evidence was recognized by the majority of the commission in the decision holding it had no such authority and that the defendant disregarded the definition of the term "waste" as given in the statutes.

The order attached to this petition for review stated that the question of increasing the minimum well allowable to 25 barrels per day was orally presented to the commission at its regular meeting for the purpose, among other things, of determining market demand and making a proration order; that a notice of the hearing was published in the usual form, which, among other things, was as follows:

"You are hereby notified that pursuant to said order the Commission will

receive evidence to determine whether the rules and regulations for the conservation of crude oil and natural gas, of this Commission should be amended; and that all persons desiring to be heard should be present at said hearing."

The order further stated that the matter of increasing the minimum allowable to 25 barrels per day was properly considered as a part of the market demand and proration hearing; that evidence was received from all desiring to be heard and that pursuant to a written memorandum filed the same day the commission concluded as a matter of law it did not have authority to fix a state-wide minimum well allowable for oil wells in the state.

The answer of the defendant commission to this petition for review admitted that the hearing had been had and the order had been made as alleged; denied that an order had been in effect providing for a state-wide minimum well allowable of 20 barrels per day; denied that the order denying the allegations was based upon evidence and alleged certain statements of the petition were merely conclusions as to the proper construction of the law. The answer further alleged the only matter before the court for consideration was the correctness or incorrectness of defendant's interpretation of the powers given it under G. S. 1945 Supp. 55-602 to 55-606, inclusive.

A petition for rehearing called attention to the arguments that had been made at the time of the original hearing. The order denying it contained no new matter. The trial court found the decision of the defendant that it did not have power under the provisions of G. S. 1945 Supp. 55-602 to 55-604, to make such an order as asked in the oral application, was erroneous and the commission had authority to establish a minimum daily allowable for oil wells in Kansas of 25 barrels per day on wells capable of producing that amount. The final judgment was that the decision and order of the commission should be set aside.

The defendant has appealed from that order. The specifications of error are that the district court erred in holding that the commission had authority under G. S. 1935, 55-601 and G. S. 1945 Supp. 55-602 to 55-606, inclusive, to establish a state-wide minimum allowable of 25 barrels per day for oil wells in the state, and in setting aside the order denying the oral application to amend the general rules providing for a minimum allowable of 25 barrels per day for the reason given.

The term "state-wide minimum daily allowable" for oil wells was used throughout the pleadings, in the briefs and in the journal

entry of judgment. It is clear from the entire record that all parties and the court intended that such words should mean "minimum daily allowable of 25 barrels per day in prorated pools."

The commission has in its rules and regulations given certain words and phrases a meaning peculiar to the administration of the statute. Some of these will be set out here so the readers not familiar with the oil business and its regulations will not be confused. They are as follows:

"Allowable shall mean the amount of oil authorized to be produced by order of the Commission.

. . . . . . . . . . . .

"Correlative rights shall mean that each owner or producer in a common source of supply is privileged to produce therefrom only in such manner or amount as not to injure the reservoir to the detriment of others or to take an undue proportion of the oil or gas obtainable therefrom, or to cause undue drainage between developed leases.

. . . . . . . . . . . .

"Minimum pool shall mean every oil producing pool located in this state which has an average well size of less than fifteen barrels per day.

"Minimum well shall mean any well which has a productivity of fifteen barrels or less.

. . . . . . . . . . . .

"Productivity shall mean the index to the daily productive ability of individual wells and pools as of the date tested, which is established as herein provided for the purpose of determining relative productive capacities but not actual or continuing productive abilities.

"Proration shall mean the regulation of the amount of allowed production for the purpose or purposes of preventing waste, undue drainage between developed leases, unratable taking or unreasonable discrimination as between operators, producers and royalty owners, within a common source of supply, or unreasonable discrimination in favor of any one pool as against any other pool in this state.

. . . . . . . . . . . .

"Reasonable market demand shall mean the demand for oil produced in Kansas for reasonable current requirements for current consumption and use within and outside of the state. Such demand is equal under normal conditions to the rate of production at which neither withdrawals from nor additions to stocks of crude oil of Kansas origin in storage occur; that is, the amount of crude petroleum which must be processed to satisfy current rates of consumption."

The commission in denying the application wrote a rather detailed memorandum opinion. This opinion was filed with the rest of the proceedings in district court and is part of the record here. It is of interest to us in determining what the commission considered on the oral application.

We learn from it that the commission makes a practice of meeting during the latter part of each month to determine the market demand for oil in the state and to make the allocation and proration orders for the next month. The statute requires that they shall be made "currently." In its proration order for January, 1943, the commission provided that due to the war emergency exception should be made in its general rules to the extent that no well capable of making the same should be assigned a daily allowable of less than 20 barrels. This was continued in the February and March, 1943, orders. In the April, 1943, order the minimum assignment of allowable was put at 25 barrels. This was carried in each proration order until the one of March, 1946, when it was again put at .20 barrels. This action of the commission brought on the application we are considering.

First, we shall take note of the statute providing for review of orders of the state corporation commission in oil proration matters. This appears in G. S. 1945 Supp. 55-606. It provides that any action for review of any order, rule or regulation of the commission may be brought against the commission in the district court of any county of the state wherein the property affected is located; that before any such action may be brought a rehearing must be filed and denied by the commission; that the action may be brought by any person aggrieved whether or not such person was the applicant for rehearing; that any rule, regulation, order or decision of the commission may be superseded by the district court upon such terms as it may deem proper; that in any such action an abstract of the record of all evidence and proceedings before the commission shall be filed by the complaining party and a counter abstract may be filed by the commission or any other interested party; that the district court may if it deems necessary remand any such action to the commission with the direction that it be further investigated; that after making further investigation the commission may change, modify or set aside the rule, regulation, order or decision; that the courts shall not be bound by any findings of. fact made by the commission; that the authority of the court shall be limited to a judgment affirming or setting aside the regulation, decision or order of the commission and appeals to the supreme court may be taken from the judgment of the district court as in any other civil actions.

Plaintiffs brought this action for review under the above statute. It will be noted the original application before the commission was

oral. No written application was filed. At the outset of the oral argument before us the commission called our attention to the fact the plaintiffs had in their counter abstract presented the oral testimony taken before the commission. The commission, in a written motion, asked us to strike this from the record because the order was not based upon evidence but upon its consideration of the statutes. We passed this motion for consideration with the merits and proceeded to hear the oral argument.

The arguments of both parties bring us to a somewhat critical analysis of the statute. The first proration statute was chapter 226 of the Laws of 1931. Section 1 of that chapter prohibited the production of crude oil in this state in such a manner as to produce waste. That section is still the law of this state. It is G. S. 1935, 55-601. The following sections of that act defined waste "to include underground waste, surface waste, and waste of gas energy,' and waste incident to the production of crude oil or petroleum" and provided for proration of the production of crude oil within the various oil pools of the state, but not between pools. There was a proviso in the statute that no power granted in the act should apply to wells from which the daily production of crude oil was less than 15 barrels per day.

Chapter 214 of the Laws of 1933 amended section 2 of chapter 226 of the Laws of 1931 (being R. S. 1931 Supp., 55-602) by providing that the term "waste," in addition to its ordinary meaning, should include economic waste, underground waste, surface waste and waste of gas energy and waste incident to the production of crude oil, that is, it added economic waste to the definition. There were other amendments to the power of the attorney general but they do not concern us here.

In 1939, by chapter 227 of the laws for that year, a comprehensive program for regulating the production of crude oil in the state was enacted. For the first time provision was made to regulate production of oil between pools on a state-wide basis (G. S. 1945 Supp., 55-602 to 55-606 and 55-609b). G. S. 1935, chapter 55, article 6, as so amended by the 1939 act, constitute the statutes under which the corporation commission has been regulating the production of oil in this state since 1939.

G. S. 1945 Supp. 55-602, redefined the term "waste" and to the definitions given in chapter 214 of the Laws of 1933 added "waste of reservoir energy." In addition that section provided that the state

corporation commission should have authority to make rules and regulations for the prevention of waste.

Section 55-602a validated all rules of the commission that were in effect at the time chapter 227 of the Laws of 1939 became effective.

Section 55-603 first set up three conditions that must exist before the statute should affect any pool, that is, it must appear that full production from that pool could only be obtained under conditions—

"(a) Constituting waste as herein defined, or (b) independently of waste, under conditions injurious to the respective correlative rights of the producers therein, or (c) under conditions unreasonably discriminating against other pools in the state . . ."

That is, before the act should apply to any pool it must appear that full production could not be had without one or more of those three things happening.

The section then provided that any person having the right to drill into and produce oil therefrom (the "therefrom" refers back to the word "pool" in the early part of the section) might take "therefrom [referring again to the pool to which reference is made in the beginning of the section] currently" no more than that proportion of all crude oil which might be produced therefrom currently without waste, or without such discrimination, which the productivity of his well or wells considered in connection with the acreage reasonably attributable to each thereof bears to the productivity of all wells therein considered in connection with the acreage reasonably attributable to each thereof. That is, in a proratable pool the commission must first ascertain how many gallons per day the well would produce if operated at its full capacity; then how much the pool would produce if all wells were operated at their full capacity; then should ascertain how much the pool could produce without waste or unreasonable discrimination or injury to correlative rights, and allow the well to produce only that proportion of its full capacity which the amount it could produce without the above three conditions happening bears to the amount that the pool could produce without those things happening, always considering the acreage attributable to a well. For illustration, assume that a pool had one well with a productivity of 50 barrels per day and another with a productivity of 200 barrels per day, each having 20 acres attributable thereto, and assume this pool's allowable was 100 barrels per day. The 50-barrel well's percentage of the aggregate pool productivity would be 20

percent, and that of the 200-barrel well would be 80 percent. The proration therefore upon a percentage basis would be 20 barrels to the 50-barrel well and 80 barrels to the 200-barrel well. The provision of the statute was a definite limitation upon the amount that might be taken from any well drilled in a proratable pool.

The section then provided that it should be the duty of the commission to so regulate the taking of crude oil from any pool within the state as to prevent waste or the inequitable or unfair taking of crude oil therefrom, that is, from the pool, by any person; to prevent unreasonable discrimination therein, that is, in the pool, and further provided that it should be the duty of the commission to prevent unreasonable discrimination in favor of any one pool as against any other pool in the allocation of production among such pools.

This is a clear statement of legislative intent that the provisions as to waste, inequitable taking and discrimination should apply to wells within prorated pools.

That section then contained the following proviso:

"That nothing contained in this section or any other provision of this act shall authorize the reduction or limitation of the full production of crude oil from any pool in this state whose average well size is fifteen barrels per day or less, but the commission may require ratable taking by any purchaser therein from the properties with which it may be connected."

This provision has never been interpreted by the court but it has been construed by the corporation commission to mean that it has no jurisdiction whatever to limit production in any pool where the average production of the wells is 15 barrels per day or less. It has never endeavored to limit production in such pools in any way. It has, however, required "ratable taking" by any purchaser in such pool. That is, it has required pipe lines taking oil from such a pool to take a certain amount from all wells in the pool.

Section 55-604 provided first that the commission was given authority over all matters involving application and enforcement of the act and to make and enforce rules, regulations and orders for the prevention of waste, as defined in the act, and for enforcing the provisions of the act. Subdivision (A) of that section then provided that "without limiting the generality of the foregoing powers and duties the commission shall have the further power and authority hereinafter set forth." That is, to apply and enforce the act and to make and enforce rules to prevent waste and to enforce the other provisions of the act, the commission should have the further power and authority thereinafter set forth.

Subdivision (B) sets forth these and provides that the commission should determine the reasonable market demand for crude oil produced in the state and in making such determination the commission should take into consideration "among other proper factors":

"(a) The estimated consumer demand; (b) offers to purchase and the good faith thereof; (c) the price or prices offered in relation to the prevailing price of crude oil generally in the state. . . ."

Then follows a proviso that the commission shall not have authority to fix the price of crude oil. Thus, there are three elements besides other factors the commission is directed to consider in fixing the "market demand" for oil. The statute does not state what the other proper factors are. Such are left to the discretion of the commission. Market demand is the first factor necessary to be ascertained by the commission in any plan of proration.

This section also provides that the commission shall allocate among the pools in the state the amount of oil that might be produced therefrom without waste, without impairment of correlative rights, and without unreasonable discrimination between pools, and that in making such allocation the commission should take into consideration "among other proper factors"—nowhere in the entire act does it appear as to what the proper factors should be—and give due and proper weight to the following:

"(d). The prevention of waste in any pool; (e) the quantity of oil that will be produced from nonprorated pools; (f) the ratio of the daily productive capacity of each prorated pool to the total daily productive capacity of all prorated pools in the state."

Then follows a complicated formula for ascertaining this ratio, and a proviso as follows:

"Provided, however, such reasonable adjustments may be made with respect to any pool or pools as the commission may find to be necessary under the practical circumstances; (g) the availability of pipe lines and other means of transportation; (h) the reasonable ability of each producer to satisfy his or its desire for oil produced in this state without concentrating purchases in any selected pool or pools, and the availability of oil to the various purchasers by exchange with or purchase from other purchasers of oil produced in this state; all to the end that so far as possible no producer or group of producers and no purchaser or group of purchasers shall have or be given any special favor or privilege, that the development and conservation of the oil resources of this state may be encouraged, and that the general welfare and prosperity of oil producers, royalty owners and the general public in this state may be promoted. Such determination and allocation shall be made from time to time as circumstances may require."

It will thus be seen that for the business of allocating production between pools the legislature directed the commission to consider five factors, but in considering those five factors the commission was directed to adjust productive capacities by such method as it might find necessary. The statute also provides that the allocation should be fair and equitable, and that reasonable adjustments should be made; that these adjustments should be such as "the commission might find to be necessary under the practical circumstances"; that the whole affair should be managed so that "the development and conservation of the oil resources of this state" might be encouraged and so "the general welfare and prosperity of oil producers, royalty owners and the general public" might be promoted. Certainly these are sweeping and broad directions and grants of power to the commission as to how the entire business of regulating oil production should be carried on.

· The next subdivision of the section is enumerated as (C). It sets up the manner in which the production of oil in each pool among the wells therein should be prorated. It is the first time the word "prorate" is used in the statute with reference to a well. The section provides that the commission in prorating the production allowed "shall take into consideration" among such other factors as it may find proper—nowhere in the statute does it appear what the other factors must be—"and give due and proper weight to" (certainly the weight to be given these factors is a matter of the discretion of the commission):

"(a) The productivity of each such well as determined by such reasonable method as the commission shall adopt for the pool; (b) the acreage of each well owner which is reasonably attributable to each of his wells; (c) the efficient utilization of the reservoir energy in the pool."

Then follows the proviso:

"Provided, That the allowable production of any well in any prorated pool shall not be reduced below fifteen barrels per day."

Both sides agree the above proviso means that no matter what the calculation as set out in the foregoing sections of the statute should determine as the allowable production in any well, it should never be reduced below 15 barrels a day.

The commission analyzes the statute about as it is analyzed in the memorandum opinion of the commission and argues that it may assert the general power granted it by the legislature only in the manner in which the legislature provided for the exercise of such

power. It cites *Phoenix Ins. Co. v. Welch*, 29 Kan. 672; *State v. Crawford*, 104 Kan. 141, 177 Pac. 360; and *Wichita R. R. v. Pub. Util. Comm.*, 260 U. S. 48, 43 S. Ct. 51, 55, 67 L. Ed. 124.

Stated succinctly the argument is that the legislature provided in the proration act that production should be allocated in each prorated pool amongst the wells therein and did not provide explicitly for fixing any general minimum allowable except the provision that the allowable for no well should ever be lower than 15 barrels daily, and hence the commission had no authority to make the order asked for in the oral application. Decisions are cited that the effect of a proviso is to limit the matter that has preceded it in the statute.

The plaintiffs, on the other hand, point out the first provision in the act that waste shall be prohibited, the broad definition of waste, then the further broad grants of power, vesting a wide discretion in the commission in enabling it to achieve the real objective of the act, that is, the prevention of waste, and argue that if the commission should conclude on substantial competent evidence that the fixing of a minimum allowable at a higher figure than 15 barrels would prevent waste, then it would have power to make such an order.

It appears that the situation which brought on these proceedings was a dispute between parties who owned wells with higher productivity on one hand and those who owned wells of a somewhat lower productivity on the other.

The commission's policy with reference to that dispute can best be stated by quoting from the memorandum opinion, as follows:

"The first prohibition in the statute is one against waste. The Commission is given power to make rules to enforce this prohibition. The Commission certainly has no power or discretion to set aside this prohibition, or modify it, but can only make such orders in this regard as will tend to effectuate it.

"The next prohibition in the statute is one against full production from a common source of supply under certain conditions. When full production cannot be taken without waste, without injury to correlative rights or without discrimination between pools, the statute prohibits any producer from taking more than his proportionate share. The words of the statute are that under these conditions no producer can take more than that proportion which the productivity of his wells bears to the productivity of all wells in the pool, the proper acreage factor being taken into consideration. This is a ceiling on any producer's right to produce. The Commission is given power to make rules to effectuate and enforce this prohibition, not to weaken or lessen or obviate it. Under proper circumstances, perhaps to prevent waste, the Commission may have authority to limit the amount of a producer's take to less than his proportionate share. But to take part of the proportionate share of

one producer and give it to another producer would not be enforcing and carrying out the provisions of the Act nor would it be carrying out a declared intent of the Act that so far as possible no producer or group of producers shall have or be given any special favor or privilege."

Later in the opinion it was said:

"The legislature further recognized that in any pools the production of no more than 15 barrels daily from any well could not cause much harm in the way of waste, if any, nor substantially affect the proportions producible by other wells, and that loss of otherwise recoverable oil might result if wells were abandoned when they were of such size. It therefore provided that the allowable production of any well should not be reduced below 15 barrels a day. It is apparent, we think, that the purpose of putting these limitations in the law was to prevent premature abandonment of wells. The legislature, of course, has complete authority to determine whether the production of oil and gas shall be regulated at all, and, if so, to what extent. It has exercised that authority and has declared that regulation is necessary, how it shall be exercised, and the point beyond which it shall not go. It could have fixed this point at 10 barrels or 25 had it determined that under the conditions then existing, such limitation was desirable. The Commission, however, is bound by the legislative policy declared in the law."

Among other allegations of the petition for review we find the following:

"Plaintiffs further allege that the denial of the application of these plaintiffs to establish a minimum allowable for oil wells in Kansas of 25 barrels per day results in and causes 'economic waste' and underground waste in the oil pools in Kansas; that the economic development, production, and conservation of the oil resources of Kansas require the establishment of a minimum allowable of 25 barrels per day on oil wells in Kansas.

"12. Plaintiffs allege that the denial of the application to establish a minimum daily allowable of 25 barrels and the decision and order of the defendant commission made on September 27, 1946, as aforesaid will result in great and irreparable injury and damage to these plaintiffs and in a loss of the natural resources of this state due to the abandonment of wells which will result therefrom; that said decision and order will likewise discourage instead of encourage development and conservation of the oil resources of this state and will be detrimental to the general welfare and prosperity of oil producers and royalty owners and the general public in the state of Kansas."

If the plaintiffs should be able to present to the commission substantial competent evidence that the dire results pleaded above would follow from a denial of the application, then it would be strange if under the broad and sweeping grant of power by the state the commission would be powerless to act. In *Bennett v. Corporation Commision*, 157 Kan. 589, 142 P. 2d 810, we said:

"We find no case directly in point, on the facts. However, some underlying

principles are well established. First, in the absence of arbitrary or capricious action or abuse of discretion by executive or administrative officers, courts do not interfere with the performance of their acts which are discretionary in character or involve the exercise of judgment."

Force is given this argument by the fact that rules and regulations of the commission are never *res judicata*. Should bad consequences follow from such an order being made the commission might change it to meet conditions as they exist.

We are expressing no opinion on the wisdom of making such an order. That is a matter for the commission and its experts with their information and training and ability to investigate all phases of the business. The matter with which we are dealing is the question of power and not the application of it.

In its memorandum opinion the commission said, in part:

"Evidence has been offered before the Commission that many operators cannot finance their drilling operations and cannot afford to invest the cost of drilling a well unless they can be assured in advance that regardless of the percentage factor which may become applicable to the particular pool in which the well may be drilled they will be allowed to produce at least 25 barrels of oil per day from such well, if the well can produce that amount. With the increased costs of material and labor, and the greater depths at which oil is now being found, we have no doubt that such a situation exists in many instances. Certainly a remedy should be provided for such a situation. If the matter of establishing the standards by which to determine the proportion of allowable production which each producer was entitled to take were one lying clearly within the jurisdiction of the Commission under present law, this evidence would have a strong persuasive force in determining Commission policy. The majority of the Commission are convinced, however, that under present law the Commission has no such discretion, and that the remedy must be sought in the legislature.

"The legislature cannot delegate the authority to define state policy or to set up the standards by which it shall be determined.

"Our statute does establish the standards by which the Commission's actions must be controlled. The authority to make rules cannot go beyond the legislative standard, or modify it, or ignore it. The standards set up in the proration law are simple and explicit. Waste is defined and prohibited. Full production must be limited under certain named conditions and when limited no producer can take more than his proportionate share. The authority of the Commission is limited to carrying out this legislative policy. In the opinion of the majority of the Commission, the Commission has no present authority to establish a state-wide minimum allowable for oil wells in this state."

The commission concluded from that portion of the proration law that it has no power to fix a minimum allowable for an individual well in any of the prorated pools of the state, but that each well must

be permitted to produce exactly on the ratio as above stated with the one exception that if the ratio would lead to cutting any well to production of less than 15 barrels per day, the ratio shall not apply to that well and 15 barrels production shall be permitted.

Certainly the question is not free from doubt. If the provisions of the statute just referred to must alone be considered then we would see no escape from the commission's construction of the law. But these provisions must be construed in connection with the whole purpose of the act and with the broad provisions with reference to the commission's power, all of which have been heretofore set out.

Suppose the statute did not contain the provision that the allowable production from any well in a prorated pool shall not be placed at less than 15 barrels, but upon a clear showing by competent evidence it appeared that unless wells were permitted to produce as much as 15 barrels per day, they would have to be prematurely abandoned, with great resultant waste, with permanent loss of oil which would never be recovered. Could it be said in such a case that the commission would be powerless to fix a minimum allowable? To so hold would defeat the very purpose of the act. The mere fact that the legislature said that the allowable production shall not be reduced below 15 barrels certainly does not rob the commission of the inherent power which it has in effectuating the primary purposes of the act.

While the immediate question before us relates to an order affecting individual wells in prorated pools throughout the state, the commission would have no power to fix a minimum allowable within any one pool, if its interpretation of the statute is correct. It would have to permit each well to produce exactly its ratable share under the formula prescribed with the one exception that production could not be reduced below 15 barrels.

It may well be that it would be more difficult to make a showing that would support an order fixing the same minimum allowable for individual wells in all the prorated pools of the state. It may be that the evidence would require a different minimum allowable for different pools in order to prevent waste or otherwise to effectuate the purposes of the act in the public interest. If the commission has power to make an order. affecting any one prorated pool it would likewise have the same power with reference to every prorated pool and the effect would be state wide as to prorated pools. Such ques-

tions go to matters of evidence of proof, rather than to the question of the commission's power which is here raised.

There are two statutory provisions with reference to 15 barrels which should not be confused. One of them is the provision found in section 55-603 which is, in substance, that no pool in the state shall be subject to proration where the average well size in the pool is 15 barrels per day or less. That provision removes certain pools entirely from proration. All the commission may do in such pools with reference to ratable taking is to provide that any purchaser therein must take ratably from the properties with which such purchaser is connected. One result of this provision is that in some pools there are large wells which are not subject to proration at all and may produce at full capacity because there are enough small wells within the pool to reduce the average well size of the pool to 15 barrels or less. This may lead to some anomalous situations, but with those we are not here concerned.

The second provision with reference to 15 barrels is the one here involved appearing in section 55-604, that in any prorated pool the allowable production of a well shall not be reduced below 15 barrels per day. It is clear that if the commisison should fix a minimum of 20 barrels, for instance, for wells in prorated pools, such action would not affect the classification as between pools subject to proration and those not subject to proration. That classification is definitely made by the statute itself. Pools where the average production is 15 barrels or less would still be nonproration pools while wells where the average is above 15 barrels would still be pools subject to proration. Of course, if there should be no well in a pool subject to proration which could produce more than 20 barrels per day, then all wells would have to be permitted to produce at capacity. But any well in a pool subject to proration which produced more than the 20 barrels would be subject to proration under the formula properly prescribed for the pool. In any event, we are not presented here with any issue of classification of pools as being subject or not subject to proration.

We hold that in the exercise of the broad powers granted to the corporation commission in the oil proration law for the purpose of prevention of waste as defined by the act, or for protection of the correlative rights of producers within prorated pools, or the prevention of inequitable or unfair taking of crude oil by any person from any pool, or the prevention of unreasonable discrimination

between producers within a pool or between pools, the commission has power to adopt a general rule or regulation, upon sufficient showing by substantial, competent evidence that such action is necessary in order to effectuate the purpose of the proration law as above stated, fixing a minimum allowable production for individual wells within the prorated pools of the state, provided that in fixing such a minimum allowable, the allowable production of any well in any prorated pool shall not be reduced below 15 barrels per day.

The judgment of the trial court is affirmed.

THIELE, J. (dissenting): In my opinion a correct disposition has not been made of this appeal, my reasons for dissent being briefly outlined as follows:

At the inception of the matter before the state corporation commission no formal written application was filed, but it is clear that the commission was asked to make an order fixing a state-wide minimum well allowable for oil wells in excess of fifteen barrels per day.

The power of the commission to regulate the production of petroleum oil and prohibit waste was first conferred by the Laws of 1931, chapter 226. Without going into detail, it may be said the commission's power was limited to common sources of supply or pools, a proviso to section 3 of that statute stating the power granted should not apply to wells from which the average daily production was less than fifteen barrels per day. There was nothing in this statute even approaching power to make a state-wide order.

Paragraph 2 of the above act was amended by the Laws of 1933, chapter 214, to expand the definition of economic waste. By the Laws of 1939, chapter 227, the original act was considerably amended, the statute as presently involved now appearing as G. S. 1945 Supp., chapter 55, article 6, and reference is hereafter made thereto. Under 55-603, provision is made for the regulation of any common source of supply, called "pool" in the statute, under rules there laid down, it being provided that nothing in the section should authorize the reduction or limitation of the full production from any pool whose average well size is fifteen barrels per day or less, but that the commission might require ratable taking by any purchaser therein from the properties with which it may be connected. Under 55-604 are provisions for rules and regulations, and setting up factors for consideration in determining the amount of oil which may be produced and sold from the several pools of the state, all as

more fully set out in the statute. It may be noted the commission is to consider the estimated consumer demand, the offers to purchase, the prices offered in relation to the price generally, the prevention of waste, and under B (*e*) *the quantity of oil that may be produced from non-prorated pools;* and further B (*f*) *that the ratio of the daily capacity of each prorated pool to the daily total capacity of all such pools shall be such that the ratio will result in a fair and equitable allocation of production among such pools,* and that the commission shall make a classification, in accordance with the statutory requirement "so that the respective pool classifications, in their order from the smallest to the largest, will be allocated a daily rate of production in percentages on a descending scale, but so as to result in a progressively increasing average daily allowed production in barrels per well from the smallest to the largest pool classification." Some intervening factors will not be noted but it is noted that under C (*c*) "That the allowable production of any well in any prorated pool shall not be reduced below fifteen barrels per day."

It seems clear that if the commission makes a state-wide order as asked, that at least two results will occur. First, if the minimum daily allowable is fixed at any amount greater than fifteen barrels per day, it must have the effect of changing the base for determining what pools are subject to consideration under 55-603. It needs no demonstration that if the minimum is raised, the number of non-prorated pools will be increased. Second, if the minimum daily allowable is fixed at any amount greater than fifteen barrels per well per day, it has the effect of changing the weight to be given the factors for consideration under 55-604, especially B (*f*), with the result that the base for determining percentages will be changed, that there will be no fair and equitable allocation of production among pools and the statutory requirement will not be met.

The purpose of the statute was to provide a method of allocation under conditions prescribed by the legislature, and the purpose of the fifteen-barrel limitation, twice repeated, was not to permit the commission to raise the limitation as it would, but to provide a measure which it could not ignore for any asserted reason that a small pool in the one instance, or a small well in the other, could not be operated except by the commission of "waste" as that term is defined in the statute. If the commission has power to fix a minimum at twenty-five barrels per well per day by state-wide order

such as was sought, then by the same authority it can make that minimum one hundred barrels per day. If that be true, then the legislature fixed no standards for the power delegated to the commission. As I read the statute, the legislature conferred no power on the corporation commission to make a state-wide order such as was sought.

I am authorized to say that Mr. Chief Justice HARVEY and Mr. Justice PARKER concur in the foregoing views.